# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**JANA O'DELL, Individually and on**                                    **PLAINTIFF**
**Behalf of All Others Similarly Situated**

**v.**                              **Case No. 4:21-CV-00260-LPR**

**QUALSCRIPT, LLC, GAYLE FAGGETTI,**
**and PAT MCCARVER**                                         **DEFENDANTS**

## ORDER

      This is a wages case.  Plaintiff Jana O'Dell is suing QualScript, LLC and its two co-owners, Gayle Faggetti and Pat McCarver.  Ms. O'Dell alleges that Defendants misclassified her as an independent contractor and thus erroneously exempted her from the minimum wage and overtime protections of the Fair Labor Standards Act and the Arkansas Minimum Wage Act.  Ms. O'Dell seeks to recover unpaid wages, liquidated damages, prejudgment interest, costs, and attorneys' fees.  Currently before the Court is Defendants' Motion for Summary Judgment.[1]  For the following reasons, that Motion is GRANTED.

## BACKGROUND

      Located in Conway, Arkansas, QualScript is a limited liability company that provides medical transcription services to medical providers.[2]  QualScript has been in business since September 29, 2006, and is co-owned by Ms. Faggetti and Ms. McCarver.[3]  Ms. Faggetti and Ms.

---

[1] Defs.' Mot. for Summ. J. (Doc. 27).

[2] Compl. (Doc. 1) ¶¶ 9, 26; Answer (Doc. 7) ¶¶ 9, 26; Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 6:8–10.

[3] Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 6:3–7, 9:5–6.

McCarver are both managers in the company as well.[4]  Ms. O'Dell worked as a medical transcriptionist for Defendants from late 2013 until the end of 2021.[5]

## I.      Ms. O'Dell's History in the Industry and Hiring at QualScript

Ms. O'Dell has decades of experience as a medical transcriptionist.  She received a certificate to become a medical transcriptionist (and began working as one) in the mid-1980s.[6]  Ms. O'Dell first worked for a family physician, Doctor James R. Weber, off and on between 1984 and 1996.[7]  She filled multiple different roles for Doctor Weber, medical transcription being only one of the roles.[8]  She was paid on an hourly basis for her work.[9]

From 1996 to 2012, Ms. O'Dell provided medical transcription services to Doctor Les Anderson.[10]  Ms. O'Dell was paid by the line for this work.[11]  She also had two other medical transcriptionists working for her as independent contractors; she paid them by the line.[12]  Ms. O'Dell testified that when Doctor Anderson was bought out by "St. Vincent," Ms. O'Dell "shut [her own] business down."[13]  She then had a brief stint as an independent contractor for RI

---

[4] Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 1; Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) ¶ 1.  In her deposition, Ms. Faggetti confirmed that both she and Ms. McCarver have managed Ms. O'Dell "over the years."  Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 41:14–42:3.

[5] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 3; Dep. of Jana O'Dell (Doc. 50) at 62:14–22.

[6] Dep. of Jana O'Dell (Doc. 50) at 9:7–11:2.

[7] *Id.* at 11:9–12:2.  Ms. O'Dell stated that she "did insurance claims" for "Plastic Surgery Associates" between 1991 and 1994 in lieu of medical transcription, but she also stated that she helped with its medical transcription from time to time.  *Id.* at 12:3–7.

[8] *Id.* at 15:19–16:8.

[9] *Id.* at 15:15–19.

[10] *Id.* at 13:6–11.

[11] *Id.* at 13:16–14:2.

[12] *Id.*

[13] *Id.* at 16:12–22.

Unlimited, a Minnesota-based medical transcription company.[14]  She was paid by the line for this work.[15]

In April of 2012, Ms. O'Dell sent a resume to QualScript.[16]  As briefly noted above, QualScript is a medical transcription company.[17]  QualScript's business model is relatively straightforward.  Medical professionals enter into agreements with QualScript wherein the medical professional pays QualScript to ensure that the medical professional's medical reports are accurately transcribed and edited.[18]  QualScript provides the transcriptionists to handle the transcribing and editing.[19]  A rational juror could infer that QualScript's profit is derived from the difference between how much it receives from the medical professionals and how much it pays the transcriptionists to do the work.[20]

When applying to QualScript, Ms. O'Dell indicated "that she had been in the medical transcription business for thirty years," and "that she specialized in certain medical fields (including radiology) . . . ."[21]  QualScript was silent on Ms. O'Dell's April 2012 application until 2013, when QualScript got a new client, Radiology Associates, P.A. (RAPA).[22]  "RAPA utilizes

---

[14] *Id.* at 17:4–20.

[15] *Id.* at 17:21–22.  Ms. Faggetti testified that it is industry standard for transcriptionists to be paid by the line as independent contractors.  Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 33:23–34:4.

[16] Dep. of Jana O'Dell (Doc. 50) at 21:15–19.

[17] Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 6:8–10.

[18] *See* Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶¶ 4–5.

[19] *See id.*

[20] *See* Dep. of Jana O'Dell (Doc. 50) at 15:10–14.

[21] Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 4.  Ms. O'Dell testified that, for her, no particular medical field was more difficult than any other to transcribe.  Dep. of Jana O'Dell (Doc. 50) at 18:13–15.  According to Ms. O'Dell, with transcription, "if you've got it, you've got it[,] [i]f you don't, you don't." *Id.* at 19:4–5.

[22] Dep. of Jana O'Dell (Doc. 50) at 21:15–22:4.

CT scans, MRIs, ultrasound and other imaging technologies in its practice."[23]  RAPA hired QualScript to "ensure[] that a sufficient number of medical transcriptionists/editors are in the 'pool' to handle the workload . . . ."[24]  To meet the demands of this new client, QualScript began searching for "medical transcriptionists with prior experience or who attended an accredited medical transcription school."[25]  It was at that point that QualScript called Ms. O'Dell and asked her to come in for an interview.[26]  Ultimately, Ms. O'Dell began working with QualScript in very late July or early August of 2013.[27]

## II.    The Independent Contractor Agreements Between Ms. O'Dell and QualScript

On July 31, 2013, Ms. O'Dell and QualScript signed two separate "Independent Contractor Agreement[s]."[28]  One agreement applied to work she would perform for QualScript's new client, RAPA, while the other applied to work she would perform for QualScript's non-RAPA clients.[29]  The Court will call one agreement the RAPA Agreement and the other agreement the non-RAPA Agreement.

The Agreements were largely composed of identical, generally applicable provisions.  But there were a few notable differences that corresponded to differences in the specific work Ms.

---

[23] Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 2.

[24] Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) ¶ 3.

[25] *See* Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 3; Dep. of Jana O'Dell (Doc. 50) at 21:15–22:4.

[26] Dep. of Jana O'Dell (Doc. 50) at 21:21–22:1.

[27] *Id.* at 23:14–21; Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) at 1; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) at 1.

[28] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) at 1, 8; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) at 1, 8.  QualScript also had Ms. O'Dell sign a Business Associate Agreement (BAA), which related to the safeguarding of Protected Health Information (PHI) as required by HIPAA.  Ex. B (Business Associate Agreement) to Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2).  The BAA referred to Ms. O'Dell as an independent contractor throughout and acknowledged that Ms. O'Dell could hire her own subcontractors.

[29] Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) ¶ 11; Pl.'s Resp. to Defs.' Statement of Facts (Doc. 32) ¶ 8.

O'Dell would perform for RAPA versus the work she would perform for QualScript's non-RAPA clients.  Below, the Court will provide a detailed overview of the provisions of these Agreements and how they operated in practice.  But the full language of these Agreements is important to the resolution of the pending Motion, so the Court has also appended the full Agreements to this Order.

### A.    Similarities Between the Agreements

The Agreements (each titled "Independent Contractor Agreement" in large, bold-face, all-caps print at the top) were principally composed of two opening "whereas" statements followed by a list of enumerated "promises and covenants."[30]  One of the opening "whereas" statements in both Agreements declared that the "Independent Contractor desires to be self-reliant and free to provide transcription services to other parties and not to be considered an employee of QualScript."[31]  Then, in the enumerated paragraphs, both Agreements were clear that Ms. O'Dell's status "shall be that of an independent contractor, and not that of an agent or employee."[32]  Both Agreements were terminable by either party at will.[33]  Both Agreements stated that Ms. O'Dell was not eligible for workers' compensation.[34]  Both Agreements stated that Ms. O'Dell needed to indemnify QualScript "from and against any and all loss, damage, cost, or expense, including attorney's fees, by reason of the Contractor's performance of her services for QualScript."[35]  And both Agreements stated that QualScript was not responsible for Ms. O'Dell's expenses (unless otherwise agreed to in writing).[36]

---

[30] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) at 1; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) at 1.

[31] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) at 1; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) at 1.

[32] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 3; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 3.

[33] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 13; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 10.

[34] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 11; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 9.

[35] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 10; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 8.

[36] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 5; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 4.

The non-RAPA Agreement stated that Ms. O'Dell "shall supply, at her sole expense, all equipment, tools, materials and/or supplies to accomplish the work to be performed."[37]  In practice, this provision applied to both her RAPA and non-RAPA work because she used the same setup for both; Ms. O'Dell worked remotely from her home and furnished her own computer, high-speed internet, and medical books.[38]  QualScript provided Ms. O'Dell with three software programs— Nuance PowerScribe 360 for use on RAPA work, Fluency for non-RAPA work, and ShareFile for accessing calendars and schedules.[39]  While QualScript provided Ms. O'Dell access to PowerScribe, RAPA handled the costs associated with that access and provided IT support.[40]  As for Fluency, the non-RAPA Agreement provided that Ms. O'Dell had to pay $10.00 semi-monthly to access the Fluency software.[41]  But at least as of July 17, 2018, QualScript had waived that fee for Ms. O'Dell.[42]  QualScript also provided a second monitor, headphones, and a foot pedal.[43] QualScript "charged [her] $10.00 a month for at least a year for [the] foot pedal."[44]

Both Agreements further provided that Ms. O'Dell was not an employee for purposes of taxes.  Specifically, the Agreements stated that "[n]either Federal, nor state, nor local income tax,

---

[37] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 6.

[38] Dep. of Jana O'Dell (Doc. 50) at 25:3–22, 41:4–11.

[39] *Id.* at 31:1–11.

[40] Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 8.  In her deposition, Ms. O'Dell said that "QualScript provided my PowerScribe 360, the Fluency and the ShareFile."  Dep. of Jana O'Dell (Doc. 50) at 31:10– 11.  In context, Ms. O'Dell was referring to QualScript providing Ms. O'Dell with the software to download on her computer.  While it may be true that QualScript "provided" the access in this sense, Ms. O'Dell's statement does not conflict with RAPA paying for the access costs and providing IT support.  Thus, the Court does not see a genuine dispute over who paid for the PowerScribe software.

[41] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 6.

[42] Ex. 7 (Email from Ms. McCarver) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-7).

[43] Dep. of Jana O'Dell (Doc. 50) at 41:17–23; Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 23.  Ms. McCarver says Ms. O'Dell had to supply her own headphones.  Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 6.  But because this motion for summary judgment is brought against Ms. O'Dell, the Court resolves this dispute in Ms. O'Dell's favor.

[44] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 23.

nor any other payroll tax of any kind, shall be withheld or paid by QualScript on behalf of the Contractor or her employees," and that the "Contractor understands that she is responsible to pay her income tax in accordance with Federal, state, and local law."[45]  Consistent with these portions of the Agreements, Ms. O'Dell signed a W-9 in which she indicated that she was an "Individual/sole proprietor" and that she was "not subject to backup withholding . . . ."[46]  Also consistent with her tax status as an independent contractor, QualScript issued Ms. O'Dell a Form 1099 each year.[47]

Because of her classification, Ms. O'Dell was able to file a Schedule C with her taxes, claiming thousands of dollars of business expenses each year.[48]  For example, in 2018, she filed a Schedule C with her taxes, titled "Profit or Loss From Business (Sole Proprietorship)."[49]  She stated her principal business or profession was "Transcription," and that her business name was "Jana O'Dell."[50]  She deducted supplies, office expenses, telephone expenses, internet expenses, postage, outside services, small equipment, legal and professional services, and car and truck expenses.[51]  She made similar deductions on her 2019 and 2020 Schedule C Forms.[52]

---

[45] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶¶ 7, 9; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶¶ 5, 7.

[46] Ex. A (Ms. O'Dell's W-9) to Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[47] There are two Form 1099s in the record: one from 2019, which indicated QualScript paid Ms. O'Dell $12,510.44, and one from 2020, which indicated QualScript paid Ms. O'Dell $11,898.09.  Ex. C (Form 1099s) to Ex. 1 (Decl. of Pat McCarver) to Defs.' Mot. for J. on the Pleadings (Doc. 11-1).  While a hard copy of the Form 1099 from 2021 is not in the record, QualScript alleges, and Ms. O'Dell does not deny, that she was paid $11,016.04 in 2021.  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 32) ¶ 24.

[48] Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 27-4); Pl.'s Resp. to Defs.' Statement of Facts (Doc. 32) ¶ 34.  Specifically, in 2018, Ms. O'Dell claimed $11,437 in expenses.  In 2019, she claimed $11,718 in expenses.  And in 2020, she claimed $8,747 in expenses.  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 32) ¶ 34.  Ms. O'Dell testified that being able to take off expenses was an advantage of her classification as an independent contractor.  Dep. of Jana O'Dell (Doc. 50) at 57:12–15.

[49] Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 27-4) at 1.

[50] *Id.* (cleaned up).

[51] *Id.* at 1–2.

[52] *Id.* at 4–5, 8–9.

Both Agreements were also clear that Ms. O'Dell was not entitled to any of QualScript's benefit plans:

> Because Contractor is engaged in her own independent contract business, she is not eligible for, nor entitled to, and shall not participate in, any of QualScript's pension, health or other fringe benefit plans, if any such plans exist.  Such participation in these fringe benefit plans is limited solely to . . . QualScript's employees.[53]

While Ms. O'Dell's classification made her ineligible for benefits from QualScript, she was able to apply for and receive "Pandemic Unemployment for Independent Contractors" during Covid.[54]

## B.   Differences Between the Agreements

Despite these significant similarities between the Agreements, the Agreements weren't completely in alignment on all key terms.  The details of the work Ms. O'Dell performed under each Agreement were slightly different.  The RAPA Agreement provided that Ms. O'Dell's work involved "transcribing and editing medical dictation."[55]  More specifically, that work involved "editing a computer-generated transcript of the doctors' notes or analyses" and was performed on RAPA's own platform, PowerScribe.[56]  In other words, Ms. O'Dell was looking at a draft report (apparently prepared by some form of voice-to-text software) and editing that report to make sure "there were periods and commas wherever they were supposed to be," and that everything was spelled correctly.[57]  In addition, and importantly, the voice-to-text software often misinterpreted

---

[53] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 8; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 6.

[54] Dep. of Jana O'Dell (Doc. 50) at 35:9–14.  Ms. O'Dell testified that she was eligible for "about 27" of the "50-some-odd weeks" that it was available; but she does not recall how much total benefit she received.  *Id.* at 35:21–36:5.

[55] Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 1.

[56] Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶¶ 2, 8; Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) ¶ 3.  In her Declaration, Ms. O'Dell refers to PowerScribe as "Defendants' software . . . ." Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 8.  But at her deposition, Ms. O'Dell stated that she did not know who owned PowerScribe. Dep. of Jana O'Dell (Doc. 50) at 27:21–23.  In the Court's view, Ms. O'Dell's inconsistent statements are not sufficient to create a genuine dispute with Defendants' testimony that the program belonged to RAPA.

[57] Dep. of Jana O'Dell (Doc. 50) at 28:17–29:5.

critical medical terms and put the wrong terms or words in the draft report.[58]  Ms. O'Dell had to identify and fix these errors.  She would need to and would often cross-reference the actual audio to ensure the text matched up.[59]  RAPA work had a turnaround time of two hours, unless it was a Priority Report, which had a turnaround time of twenty minutes.[60]  Ms. O'Dell was paid $0.05 per line (composed of 65 visible black characters) for her RAPA work.[61]

The non-RAPA Agreement provided that Ms. O'Dell's work involved "transcribing medical dictation."[62]  More specifically, instead of editing a machine-created draft report, Ms. O'Dell's non-RAPA work involved listening to an audio file and fully transcribing what was said—starting from scratch.[63]  The non-RAPA work was performed on QualScript's platform, Fluency.[64]  There were several different client accounts on Fluency,[65] but Ms. O'Dell only ever

---

[58] *Id.* at 29:3–14.

[59] *Id.* at 29:21–30:2.

[60] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 8; Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) ¶¶ 2, 7.  It is not entirely clear if the two-hour deadline starts running when the report is entered into the system by the doctor or if it starts running when the transcriptionist opens the document to begin editing it.  *See* Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) ¶ 7 ("Because of the 2-hour turnaround time required by RAPA on its radiology reports, a medical transcriptionist knows once she actively downloads a report, she needs to complete it.").  The resolution of this question is unnecessary and does not affect the outcome of this case.

[61] Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 4.  Ms. Faggetti testified in March of 2022 that the editing work QualScript does for RAPA currently constitutes "17 to 18%" of QualScript's annual revenue.  Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 19:15–20:7.

[62] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 1.

[63] Dep. of Jana O'Dell (Doc. 50) at 28:20–30:8; Aug. 23, 2022 Hr'g Tr. (Rough) at 30.

[64] Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 13; Pl.'s Resp. to Defs.' Statement of Facts (Doc. 32) ¶ 16 (referring to Fluency as "Defendant's Fluency platform").

[65] Ms. Faggetti testified that QualScript has consistently had around eighteen to twenty clients over the past few years and that RAPA is only one of those clients.  Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 18:11–19.  So it stands to reason that QualScript has had around seventeen to nineteen clients on Fluency over the past few years.

worked on orthopedics.[66]   Ms. O'Dell was paid $0.075 per line (composed of 65 visible black characters) for this non-RAPA work.[67]

The record does not provide specific details on how the Fluency system operated, but the PowerScribe system for use on RAPA work operated as follows.  First, Ms. O'Dell would login to the PowerScribe system from her home computer.  Logging in automatically opened the "editing screen."[68]   Second, Ms. O'Dell clicked the "editors work list" button, which generated a list of every report "in line waiting to be" edited.[69]  Ms. O'Dell would have to manually select whichever report she was going to work on first.[70]   What happened next depended on whether or not Ms. O'Dell had "Auto Feed" turned on.  If she had Auto Feed turned on, subsequent reports would be automatically fed to her on a "first in/first out basis."[71]   Once she finished editing a report and submitted it, "RAPA's system automatically [fed] the next report in the queue to her . . . ."[72]   If she did not have Auto Feed turned on, she would get to manually select subsequent reports to work on.[73]

---

[66] Dep. of Jana O'Dell (Doc. 50) at 27:9–19.

[67] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 4.

[68] Dep. of Jana O'Dell (Doc. 50) at 32:2–8.

[69] *Id.*

[70] Ms. McCarver testified that Ms. O'Dell had to "manually pull up the first report to edit" and then she could set "the platform to 'Auto Feed' to continue to work."  Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 9.  Ms. O'Dell stated that "if you're on auto feed, [the report] automatically populates."  Dep. of Jana O'Dell (Doc. 50) at 32:15–16.  However, it is not clear that Ms. O'Dell was describing what happened for the first document or what happened for subsequent documents.  Thus, the Court does not find that there is actually a genuine dispute between the parties.

[71] Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) ¶ 4.

[72] *Id.*  While Defendants are clear that RAPA's system doles out the assignments, Ms. O'Dell stated in her Declaration that "Defendants constantly monitored and regulated the incoming assignments and parceled them out . . . ."  Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 8.  However, in her deposition, Ms. O'Dell stated that the "system" automatically parceled out the assignments.  Dep. of Jana O'Dell (Doc. 50) at 39:23–40:7.  Because her later deposition conflicts with her Declaration, and because the Court has already decided that PowerScribe was not Defendants' software, *see supra* note 56, the Court finds that RAPA's PowerScribe system, rather than Defendants, parceled out the assignments.

[73] Dep. of Jana O'Dell (Doc. 50) at 32:13–17.

It was up to Ms. O'Dell whether or not she turned on the Auto Feed feature.  She testified that her decision mainly depended on workflow:

> When I first started we were very busy, and I never turned on auto feed, and we had sometimes 100 to 150 reports in line to do and we had about 13 girls or ladies working.  Toward the last couple of years that I was there, we went down to about five girls and two part-time, and you had to get on auto feed to get any work.[74]

If the work was slow and Ms. O'Dell turned off Auto Feed temporarily, "it would take [her] forever to get back in line to work."[75]

Ms. O'Dell worked on the Fluency platform from very late July or early August of 2013 until the RAPA work went live in November or December of 2013.[76]  But after that, about "90 percent" of Ms. O'Dell's work was related to RAPA.[77]  Ms. O'Dell testified that sometimes, when the RAPA system went down or when the RAPA work was slow, she would use Fluency (for non-RAPA work).[78]  But Ms. O'Dell was reluctant to do so.  Ms. O'Dell testified that "RAPA was a whole lot easier to do than Fluency," that she "could make more money on RAPA than [she] could on Fluency," and that she "hated Fluency."[79]

---

[74] *Id.* at 32:21–33:1.

[75] *Id.* at 33:16.

[76] *Id.* at 23:22–24:3.

[77] *Id.* at 26:16–22.

[78] *Id.* at 30:9–20.  Ms. McCarver testified in March of 2022 that Ms. O'Dell "produced zero lines of work on [Fluency over] the past 3 years."  Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 13.  This conflicts with Ms. O'Dell's testimony.  Ms. O'Dell testified that she "did do a little bit of Fluency[,] but not much," when work was slow after Covid.  Dep. of Jana O'Dell (Doc. 50) at 35:9–36:14.  Additionally, she testified that she did work for doctors on Fluency when PowerScribe went down "[a] couple of times . . . ."  *Id.* at 30:25.  Because this motion for summary judgment is brought against Ms. O'Dell, the Court will resolve this conflict in favor of Ms. O'Dell.

[79] Dep. of Jana O'Dell (Doc. 50) at 28:1–16, 30:25.

### III.   Ms. O'Dell's Schedule

Initially, Ms. O'Dell thought that the arrangement she had with QualScript would give her "some freedom and flexibility . . . ."[80]  But that thought changed once she began working with QualScript; she said that "it became apparent that [she] would not have the freedom or flexibility that [she] had hoped for."[81]

In her Declaration, Ms. O'Dell stated that even though she was able to work from home, she was required to work at specific times.[82]  She stated that she "was required to be available to work from 8:00 am to 5:00 pm, Monday through Friday," unless she "had stated that [she] was unavailable" in advance.[83]  And if she "wasn't logged in at the beginning of [her] shift, [she] received a call or text from the office" telling her "to log in and get to work."[84]

In her deposition, Ms. O'Dell provided a little more detail on the scheduling process. Around the 15th or 20th of each month, Ms. McCarver would send out an email asking for Ms. O'Dell's "days off or the days [Ms. O'Dell couldn't] work and what shifts [Ms. O'Dell] prefer[red] to work as soon as possible, so [Ms. McCarver] c[ould] get [Ms. O'Dell's] calendar [for next

---

[80] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 7.

[81] *Id.*

[82] *Id.* ¶ 10.  Ms. McCarver testified that "[t]here are no set schedules for independent contractors during normal business hours, Monday through Friday . . . ."  Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 10.  Because this motion for summary judgment is brought against Ms. O'Dell, the Court will resolve this conflict in favor of Ms. O'Dell, at least as a general matter.  So, for summary judgment purposes, Ms. O'Dell generally had to be logged on to her computer from 8:00 am to 5:00 pm on days she was working.  However, there is definitive documentary evidence that this general scheduling rule was quite flexible, and that Ms. O'Dell often took hours off (or the whole day) on days she was scheduled to work—without consequence.  *See infra* notes 96–103 and accompanying text.

[83] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 11.

[84] *Id.* ¶ 10.  Ms. O'Dell attached a number of emails and text messages from QualScript telling her she needed to log in on time.  *See, e.g.*, Ex. 2 to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-2) ("8:00 a.m. is the time to log on . . . I am looking for everyone . . . that is NOT logged on to work at 8:27 a.m."); Ex. 4 to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-4) ("Today is the second time this week that you have not logged on until noon or very close to it . . . I am truly feeling disrespected and that you do not value your job.").

month] started."[85]  Ms. O'Dell would then respond with her availability.[86]  If something came up and Ms. O'Dell was unable to work a day she had already agreed to work, she was "required to get it covered by someone else."[87]  Most of the time someone was able to cover her.[88]  However, "[t]here were times when [Ms. O'Dell] would ask for a time off that . . . three or four other people [also] asked [off], and whoever asked first got it off, so [Ms. O'Dell] would end up working a shift [she] didn't want to work or working at a time [she] really needed to be off . . . ."[89]

Ms. O'Dell testified that this situation—working a shift she did not want to—primarily occurred over the holidays.[90]  The only specific example Ms. O'Dell described occurred around Christmas of 2020.  According to Ms. O'Dell's testimony, despite only volunteering to work from 8:00 pm to 2:00 am on Christmas Eve, she was "required" to work all day on Christmas Eve and then again on Christmas Day.[91]  In her deposition, Ms. O'Dell asserted that she covered her coworker's 5:00 pm to 2:00 am Christmas Eve shift thinking that doing so would relieve her of working the earlier 4:00 am to 8:00 am shift that day.[92]  But she ended up working the 4:00 am to 8:00 am shift as well, "and then [also had] to work 2:00 [pm] to 8:00 [pm] Christmas day."[93]

---

[85] Dep. of Jana O'Dell (Doc. 50) at 37:21–38:3.

[86] *See, e.g.*, Ex. D to Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1).

[87] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 12.  Rachel Rogers, a former transcriptionist for QualScript, testified that the process was simpler than that.  Ms. Rogers "never had any issues with taking off during a shift [Ms. Rogers] agreed to work."  Ex. 3 (Decl. of Rachel Rogers) to Defs.' Mot. for Summ. J. (Doc. 27-3) ¶ 8.  She stated that she "simply sent QualScript an e-mail indicating when I would be off."  *Id.*  Because this motion for summary judgment is brought against Ms. O'Dell, the Court resolves this inconsistency in Ms. O'Dell's favor.

[88] Dep. of Jana O'Dell (Doc. 50) at 38:15–23.

[89] *Id.* at 37:2–6.

[90] *Id.*

[91] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 21.

[92] Dep. of Jana O'Dell (Doc. 50) at 39:4–13.

[93] *Id.* at 39:15–18.

As it turns out, Ms. O'Dell's testimony about her 2020 Christmas Eve shifts varies significantly from all the documentary evidence.  Ms. Faggetti (from QualScript) attached emails to her Declaration that (definitively) tell a different story.[94]  In the attached emails, Ms. O'Dell agreed to work from 4:00 am to 8:00 am and from 8:00 pm to 2:00 am on Christmas Eve, even though Ms. McCarver offered to find someone to cover either of those shifts for her.[95]  Still, the emails do not provide any insight into whether Ms. O'Dell was required to cover the additional 5:00 pm to 8:00 pm window on Christmas Eve, or whether she was required to work 2:00 pm to 8:00 pm on Christmas Day.  On those two points—being required to be logged in to the computer from 5:00 pm to 8:00 pm on Christmas Eve and 2:00 pm to 8:00 pm on Christmas Day—Ms. O'Dell gets the benefit of the doubt for summary judgment purposes.

There are other significant discrepancies between Ms. O'Dell's testimony and the documentary evidence in the record.  For example, although Ms. O'Dell stated that she was required to give advance notice of her days off, the record shows that there were numerous times when Ms. O'Dell informed QualScript the day of her shift that she was unable to work for some or all of her shift—without consequence.[96]  Here are several examples.  At 8:35 am on October 6, 2021, she emailed QualScript that she would "be out today."[97]  At 9:20 am on October 14, 2021, she emailed QualScript that she would "[b]e gone a couple [of] hours" for a birthday breakfast with her family.[98]  At 9:48 am on November 17, 2021, she emailed QualScript to "[c]ount [her]

---

[94] Ex. D to Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) at 20–22.

[95] *Id.*

[96] Ex. 2 to Ex. 1 (Dep. of Jana O'Dell) to Defs.' Mot. for Summ. J. (Doc. 27-1).

[97] *Id.* at 70.

[98] *Id.* at 71.

out today."[99]   At 3:25 pm on November 18, 2021, she emailed QualScript that she was signing off early to "[go] to Jax to help look for [her] mom."[100]   At 9:13 am on December 16, 2021, she emailed QualScript that she was "going to be out all day instead of half a day."[101]   At 1:42 pm on December 20, 2021, she notified QualScript that she was taking her mother to the Emergency Room and wasn't sure if she would be back on the rest of the day.[102]   And at 11:19 am on December 29, 2021, she emailed QualScript that she signed out early because there was "[t]oo much lightning here to risk [her] computer."[103]

In addition to her normal scheduled work, Ms. O'Dell was assigned one or two weekends a month to work as a weekend coordinator.[104]   In this role, she had to be on call from 5:00 pm Friday until 8:00 am on Monday "to ensure that the queue of assignments was being done and . . . to be available in case of emergency transcription needs."[105]   She estimated that, in general, she worked "around eight to ten hours each weekend on which [she] took call."[106]   Some weekends, she would end up helping with transcription work as well.[107]   Ms. O'Dell was paid $100 for the weekend in addition to any lines she ended up transcribing.[108]   Ms. O'Dell "was very glad" when she was asked to work the weekend coordinator shift.[109]

---

[99] *Id.* at 77.

[100] *Id.* at 79.

[101] *Id.* at 83.

[102] *Id.* at 85.

[103] *Id.* at 88 (cleaned up).

[104] Dep. of Jana O'Dell (Doc. 50) at 47:21–49:10; Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 13. Ms. O'Dell started working these shifts beginning around 2015 or 2016. Dep. of Jana O'Dell (Doc. 50) at 50:1–6.

[105] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 13.

[106] *Id.* ¶ 18.

[107] Dep. of Jana O'Dell (Doc. 50) at 48:18–20.

[108] *Id.* at 48:21–49:2.

[109] *Id.* at 49:6–10.

With respect to the weekend coordinator role, Ms. O'Dell testified that after she ensured that whoever was supposed to be working was logged in and didn't have any issues, she "could go back to bed."[110]  But Ms. O'Dell would try not to do anything outside of her house.[111]  If she had her phone and she gave the transcriptionists a heads-up, she "might" run a twenty-minute errand.[112]  But Ms. O'Dell would not "go to church [or] go shopping" like "some of the [other] ladies" would.[113]  Rachel Rogers, a former transcriptionist for QualScript, stated in her Declaration that the weekend coordinator role required about "15 minutes per day" of work.[114]  Ms. Rogers stated that she "would check [her] computer twice or three times a day (but that was not a requirement)" and that she did not have to stay at home and "would even go to church . . . ."[115]

That's really all the specifics that the record reveals in terms of Ms. O'Dell's schedule.  At her deposition, Ms. O'Dell testified that she had provided her counsel with monthly calendars from January of 2018 to December of 2021 on which she marked how many jobs she did on a particular day and whether it was a slow day or not.[116]  But these calendars have not been produced and are not part of the record.[117]

---

[110] *Id.* at 50:17–23.

[111] *Id.* at 51:7–23.

[112] *Id.*

[113] *Id.*

[114] Ex. 3 (Decl. of Rachel Rogers) to Defs.' Mot. for Summ. J. (Doc. 27-3) ¶ 9.

[115] *Id.*

[116] Dep. of Jana O'Dell (Doc. 50) at 63:17–24.

[117] Ms. O'Dell did provide (by way of declaration) the hours she worked and the pay she received over three different pay periods and two specific days.  She testified that, between August 1st and August 15th of 2021, she worked 72 hours and received $341.45 ($4.74 per hour).  Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 20.  She testified that, between August 16th and August 31st of 2021, she worked 77 hours and received $312.55 ($4.06 per hour).  *Id.*  She testified that, between September 1st and September 15th of 2021, she worked 53.5 hours and received $297.17 ($5.55 per hour). *Id.*  And she testified that she made $72.25 on Christmas Eve in 2020 for 10 hours of work and $22.12 on Christmas Day in 2020 for 6 hours of work.  *Id.* ¶ 21.  But Ms. McCarver told her ahead of time that, for those Christmas Eve and Christmas Day shifts, "[m]ost likely there [would] be little to NO work."  Ex. D to Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) at 20.

## IV.    Ms. O'Dell's Earnings

Because Ms. O'Dell "was not included in any [of QualScript's] business decisions," nor was she financially invested in QualScript, her ability to increase her earnings depended almost exclusively on how many lines she transcribed.[118]  Ms. O'Dell acknowledged that in theory she could earn more money by transcribing more documents, but she testified that "in reality [she] had little control over the amount of work [she] could perform."[119]  According to Ms. O'Dell, this lack of control with respect to earnings was only partially due to the scheduling issues discussed above; the other cause was that the amount of work fluctuated during her time at QualScript.  Ms. O'Dell's point seems to be that a person can't take on more work when there is none to be had.

Ms. O'Dell testified that, between 2013 and 2019, she "worked [her] butt off."[120]  Sometimes there would still be "75 jobs in line" at the end of her shift, and so she would decide to stay on until "7:00 or 8:00" to help out.[121]  But then, around the time Covid hit, "some of the doctors [at RAPA] that always sent [QualScript] work started self-editing" and "[t]he bottom fell

---

Additionally, Ms. O'Dell has asserted the general number of hours she worked and her rate of pay.  She testified that she generally worked "from 8:00 am to 5:00 pm Monday through Friday . . . ."  Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 18.  She estimates that she worked "five to eight additional [night] shifts a month" for which she was paid an extra $20.00 per shift.  Id. ¶¶ 15, 18.  She was also assigned one to two weekends a month to work as a weekend coordinator, on which she estimates that she "worked around eight to ten hours . . . ."  Id. ¶ 18; Dep. of Jana O'Dell (Doc. 50) at 47:23–49:10.  Recall that she was paid an additional $100 to work as a weekend coordinator.  Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 15.  Overall, Ms. O'Dell estimates that she worked "between 40 and 50 hours" on weeks when she was not a weekend coordinator, and "between 50 and 60 hours" on weeks when she was a weekend coordinator.  Id. ¶ 19.

[118] Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 38:9–39:17; Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 9.  Both Agreements stated that the "Contractor has no authority to enter into contracts or agreements on behalf of . . . QualScript," and "[t]his Agreement does not create a partnership between the parties."  Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 15; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 12.

[119] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 16.

[120] Dep. of Jana O'Dell (Doc. 50) at 34:1–4.

[121] Id. at 45:10–21.

out."[122] Ms. O'Dell testified that when the work slowed up, she would "go watch a movie or a TV show and come in and check every 30 minutes [to] see if [there was] something there."[123] As long as she "move[d] [her] mouse around and click[ed] on a couple of things" every "hour and a half to two hours," the system would keep her logged in.[124] Despite the downturn she described, Ms. O'Dell does not remember asking QualScript for much Fluency (non-RAPA) work because in 2020 and 2021, she "was having to deal with [her] parents a lot."[125]

Ms. O'Dell's assertion that she couldn't have earned more even if she wanted to earn more is difficult to square with the record, which reflects several days when Ms. O'Dell's productivity was seemingly low given the hours she worked. For example, on September 28, 2021, Ms. O'Dell was logged on but did not edit a single report between 9:52 am and 2:28 pm.[126] On December 8, 2021, Ms. O'Dell completed eight reports in the same time window that another transcriptionist completed forty.[127] On May 4, 2021, another medical transcriptionist produced nearly four times the amount of lines that Ms. O'Dell produced over the same time period.[128] And on September 21, 2021, Ms. O'Dell edited 72 jobs (781 lines) over 8 hours and 33 minutes, while another transcriptionist edited 129 jobs (1,785 lines) over 8 hours and 36 minutes.[129]

In any event, Ms. O'Dell also had another avenue for profits. Ms. O'Dell could provide transcription services to other people or entities as she saw fit (as long as she didn't solicit

---

[122] *Id.* at 34:1–35:8.

[123] *Id.* at 46:22–25.

[124] *Id.* at 46:10–21.

[125] *Id.* at 36:9–16, 75:10–19.

[126] Ex. D to Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[127] Ex. C to Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[128] Ex. E to Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[129] Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 11(c). In addition to providing these specific examples, Ms. McCarver also testified generally that QualScript had "medical transcriptionists who worked solely on the RAPA platform who made two-to-three times the amount that [Ms.] O'Dell made." *Id.* ¶ 10.

QualScript's clients).[130]  It is true that Ms. O'Dell testified that it would "be very difficult" to do any other work simultaneously "because of the hours [she] worked . . . ."[131]  And she testified that, even with the downturn in work after Covid, she had to "be ready and waiting" even when "there was no work to perform in the queue . . . ."[132]  But the record shows that, overcoming these obstacles, Ms. O'Dell worked on a number of side projects during her time at QualScript.[133]

One year, Ms. O'Dell worked for the Arkansas Youth Turkey Hunt.[134]  Ms. O'Dell "typed the package handout for the parents" and "typed the package handout for the celebrities" who were "guiding the kids on the hunt."[135]  Ms. O'Dell testified that this job was "an off-and-on thing for a few months . . . ."[136]  Ms. O'Dell also performed work for Arkansas Automatic Gate Systems.[137]  She "typed their employee handbook and materials that they needed to purchase . . . ."[138]  This was a one-time deal that lasted a couple of weeks.[139]  Additionally, Ms. O'Dell typed some employee

---

[130] The Agreements included a non-solicitation clause. Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 18; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 15.

Ms. McCarver testified in March of 2022 that "[a]t least five current medical transcriptionists have worked for themselves or another company at the same time they worked for QualScript." Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 14. And Ms. Rogers testified that she had "worked for another transcription company while working for QualScript." Ex. 3 (Decl. of Rachel Rogers) to Defs.' Mot. for Summ. J. (Doc. 27-3) ¶ 5. Ms. O'Dell does not directly dispute this. Instead, Ms. O'Dell testified that if anyone did this, "[she] did not know it." Dep. of Jana O'Dell (Doc. 50) at 53:15–21.

[131] Dep. of Jana O'Dell (Doc. 50) at 45:1–6.

[132] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 17. Ms. Faggetti testified that "no one has to sit at the computer waiting for the next assignment if the queue is empty." Ex. 1 (Decl. of Gayle Faggetti) to Reply in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 17-1) ¶ 6. Because this motion for summary judgment is brought against Ms. O'Dell, the Court resolves this dispute in Ms. O'Dell's favor.

[133] Dep. of Jana O'Dell (Doc. 50) at 58:6–62:12. Ms. O'Dell earned $4,277.67 in 2019 and $3,227.94 in 2020 on projects unrelated to her work for QualScript. Ex. 1 to Defs.' Mot. to Compel (Doc. 18-1) at 13, 15.

[134] Dep. of Jana O'Dell (Doc. 50) at 58:6–11.

[135] *Id.* at 58:12–17.

[136] *Id.* at 58:23–25.

[137] *Id.* at 59:23–24.

[138] *Id.* at 59:25–60:4.

[139] *Id.* at 60:7–8, 21–24.

handbooks for the owner of Lindsey's Resort.[140]  This was also a one-time project.[141]  Finally, Ms. O'Dell worked on a confidential project for which she was paid a "straight fee."[142]  Ms. O'Dell testified that she did not feel the need to tell QualScript about any of these projects because she worked on them "on [her] own time and not any time during the hours [she] was working a shift for [QualScript]."[143]

In addition to the foregoing potential avenues for profits, Ms. O'Dell had the ability to hire her own subcontractors to do more assignments with QualScript.[144]  According to Ms. O'Dell, however, the industry standard is "to pay [subcontractors] about two cents a line less than what you're getting."[145]  And in 2018, Ms. O'Dell's request for a half-cent to a full-cent raise was denied.[146]  Thus, in Ms. O'Dell's view, given what she was making, any potential subcontractor was better off working directly for QualScript and would not have agreed to work for Ms. O'Dell.[147]

## V.   The Instant Lawsuit

On April 5, 2021, Ms. O'Dell filed the instant lawsuit.[148]  In summary, she claims that her pay did not meet the hourly minimum wage requirements (or the overtime pay requirements) of the FLSA or the AMWA.[149]  After discovery closed, QualScript, Ms. Faggetti, and Ms. McCarver

---

[140] *Id.* at 60:9–18.

[141] *Id.*

[142] *Id.* at 60:25–61:14.

[143] *Id.* at 62:6–13.

[144] *See* Ex. B (Business Associate Agreement) to Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[145] Dep. of Jana O'Dell (Doc. 50) at 15:6–9.

[146] Ex. 7 to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-7).

[147] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 14–15.

[148] Compl. (Doc. 1).

[149] *Id.*

filed a Motion for Summary Judgment, arguing that Ms. O'Dell's status as an independent contractor doomed her FLSA and AMWA claims.[150]   In response, Ms. O'Dell argues that QualScript misclassified her as an independent contractor.[151]   The dispositive issue on this motion is whether Ms. O'Dell should be considered an independent contractor or a QualScript employee for purposes of the FLSA and the AMWA.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[152]   Conversely, if the nonmoving party can present specific facts "showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[153]   The moving party has the burden of showing that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[154]   If the moving party meets that burden, the burden then shifts to the nonmoving party to show that there is a genuine dispute of material fact.[155]   The nonmoving party meets this burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine issue for trial."[156]   The Court must view the evidence in the light most

---

[150] Defs.' Mot. for Summ. J. (Doc. 27).

[151] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31).

[152] Fed. R. Civ. P. 56(a).

[153] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[154] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[155] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

[156] *Celotex Corp.*, 477 U.S. at 322–24 (citation omitted).

favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences.[157]

## DISCUSSION

The Fair Labor Standards Act (FLSA) requires that "[e]very employer shall pay to each of his employees . . . not less than . . . $7.25 an hour . . . ."[158]  The FLSA further requires that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of [forty hours] at a rate not less than one and one-half times the regular rate at which he is employed."[159]  The FLSA defines "employee" as "any individual employed by an employer," and defines "employ" as "to suffer or permit to work."[160]

Under governing Eighth Circuit precedent, the FLSA does not apply to "true independent contractors . . . ."[161]  But the FLSA's "broad definition of employ 'stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'"[162]  Determining whether an individual working with a company is an employee or an independent contractor of that company—for purposes of the FLSA—has bedeviled many a court.  Governing precedent clearly indicates the determination

---

[157] *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

[158] 29 U.S.C. § 206(a)(1)(C).  Ms. O'Dell also asserted minimum wage claims under the AMWA.  The AMWA set the minimum wage at $6.25 from October 1, 2006, until January 1, 2015; at $7.50 on January 1, 2015; at $8.00 on January 1, 2016; at $8.50 on January 1, 2017; at $9.25 on January 1, 2019; at $10.00 on January 1, 2020; and at $11.00 on January 1, 2021.  *See* Ark. Code Ann. § 11-4-210(a).

[159] 29 U.S.C. § 207(a)(1).  Ms. O'Dell also asserted unpaid overtime claims under the AMWA.  The AMWA also provides that compensation over forty hours per week must be at a rate not less than one and one-half times the regular rate of pay for that employee.  Ark. Code Ann. § 11-4-211(a).

[160] 29 U.S.C. § 203(e)(1), (g).

[161] *Karlson v. Action Process Serv. & Priv. Investigations, LLC*, 860 F.3d 1089, 1092 (8th Cir. 2017) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)).

[162] *Id.* (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

involves an analysis of the "economic reality" of the relationship between the individual and the company.[163]  But the precise manner, scope, and contours of that analysis have yet to crystallize. And, adding an additional level of complexity to the analysis, the governing precedent distinguishes between questions of fact for the jury (if a rational juror could go either way) and questions of law for the judge (regardless of what a rational juror might conclude).  While "the precise nature of [an individual's] duties and relationship with the alleged employer" are questions of fact, the ultimate determination of whether the individual is an "employee" or an "independent contractor" is a legal determination.[164]

Neither the Supreme Court nor the Eighth Circuit has established a definitive approach for making the ultimate legal determination.[165]  Many courts, including the Eighth Circuit, have approvingly nodded at a non-exhaustive, multi-factor "economic realities" test.  While the precise wording of the non-exhaustive factors mutates slightly from case to case, at their core, these factors are:

> (i)    the degree of control exercised by the company over the individual with respect to that individual's work and business operations;

---

[163] *Id.* (citation omitted).  As discussed *supra* notes 158–59, Ms. O'Dell asserted claims under both the AMWA and the FLSA.  The definition of employee in the AMWA tracks the FLSA.  *See* Ark. Code Ann. § 11-4-203(2)–(3).  The AMWA excludes independent contractors, whom it defines as "any individual who contracts to perform certain work away from the premises of his or her employer, uses his or her own methods to accomplish the work, and is subject to the control of the employer only as to the result of his or her work . . . ."  *Id.* § 11-4-203(3), (6).  The Arkansas Administrative Code provides that the Arkansas Department of Labor "may rely on . . . federal precedent established under the Fair Labor Standards Act in interpreting and applying the provisions of [the AMWA] . . . except to the extent a different interpretation is clearly required."  § 235.01.1-112.  Neither party has suggested a different analysis should apply to Ms. O'Dell's AMWA claims than applies to Ms. O'Dell's FLSA claims.  *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 18; Br. in Supp. of Defs.' Mot. for Summ. J.  (Doc. 28) at 14.  So the Court will employ the same approach for both.

[164] *Karlson*, 860 F.3d at 1092–93.

[165] *See United States v. Silk*, 331 U.S. 704, 716 (1947) ("Probably it is quite impossible to extract from the statute a rule of thumb to define the limits of the employer-employe[e] relationship. . . . No one [of the factors listed by the Court] is controlling nor is the list complete.");  *Karlson*, 860 F.3d at 1092 ("[N]either the Supreme Court nor this court has ever held that [the multi-factor economic realities test] is the governing standard.");  *Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (8th Cir. 2022) ("We assume without deciding that the economic realities test is appropriate in determining whether a worker is an employee or an independent contractor under the FLSA.").

(ii)     the relative investments of the company and individual with respect to the alleged work;

(iii)    the degree to which the individual's opportunity for profit and loss is determined by the company;

(iv)     the skill and initiative required in performing the work;

(v)      the permanency of the relationship between the company and individual; and

(vi)     the degree to which the individual's tasks are integral to the company's business.[166]

The governing Supreme Court and Eighth Circuit precedent gives the distinct impression that the foregoing factors are less a test than they are a helpful, but not constrictive, guide for conducting some sort of global totality-of-the-economic-circumstances analysis.  And it would be a mistake to think of the expressly identified factors as capable of being isolated and analyzed on their own.[167]  Many considerations within one factor bleed into a second factor, either compounding or mitigating the force of other considerations in that second factor.

Furthermore, the caselaw's repeated reminders that the list of factors is non-exhaustive is more than just empty rhetoric.  For example, although it is not identified as a discrete factor, courts often consider in their analysis how the parties view their relationship—by looking at the language of the contract governing that relationship and the subsequent tax-and-benefits-related behavior of each of the parties.  Indeed, the Eighth Circuit has promoted such factors to prominence.  In

---

[166] *See, e.g.*, *Karlson*, 860 F.3d at 1093; *Roslov v. DirecTV Inc.*, 218 F. Supp. 3d 965, 972 (E.D. Ark. 2016).  Courts have used slightly different verbiage to describe some of the factors.  *Compare Karlson*, 860 F.3d at 1093 ("(i) the degree of control exercised by the alleged employer over the business operations; (ii) the relative investments of the alleged employer and employee . . . ."), *with Roslov*, 218 F. Supp. 3d at 972 ("(1) extent of defendant's control over plaintiffs; (2) plaintiffs' investment in their own business . . . .").  The nomenclature the Court uses above is a hybrid of these slightly different naming conventions.  But the specific nomenclature is not important.  Despite the slight variations among the cases in the naming of these factors, the cases' analyses of each factor are substantially the same.

[167] *See McComb*, 331 U.S. at 730 (noting that "the determination of the relationship does not depend on . . . isolated factors but rather upon the circumstances of the whole activity").

*Karlson v. Action Process Service & Private Investigations, LLC*, the Eighth Circuit emphasized certain tax-and-benefits-related contractual provisions and resulting behavior that were "especially indicative of an independent-contractor relationship":

> A 2011 Work for Hire/Independent Contractor Agreement governed the parties' relationship during the period Karlson sought unpaid overtime damages.  The Agreement provided that APS would not provide fringe benefits, contribute to worker's compensation, or withhold federal or state taxes for Karlson, but would provide a Form 1099-MISC showing the amount it paid Karlson for his services each year.  Karlson filed a Schedule C (Profit or Loss From Business) with his annual federal income tax Form 1040 on which he deducted his process serving expenses, resulting in minimal or no personal income tax liability.  These factors are "[e]specially indicative of an independent-contractor relationship."[168]

Accordingly, while the Eighth Circuit has made clear that the mere labeling of an individual as an independent contractor in the contract is "not controlling" or "solely determinative," the Eighth Circuit has simultaneously acknowledged the important weight to be given to contractual terms that comprehensively set out an independent contractor relationship—especially where the subsequent tax-and-benefits-related behavior of the parties conforms to those terms.[169]

Ms. O'Dell disputes this reading of the Eighth Circuit precedent.[170]  On Ms. O'Dell's read of the precedent—particularly *Karlson* and *Lester v. Wildwood Financial Group, Ltd.*—the contract's language cannot be a prominent part of the analysis.  Ms. O'Dell believes these two cases limit the weight of the contract's language to—at most—the same as any other factor in the totality-of-the-economic-circumstances analysis.[171]  Ms. O'Dell's approach has several serious flaws.

---

[168] *Karlson,* 860 F.3d at 1095 (alteration in original) (quoting *Alexander v. Avera St. Luke's Hosp.*, 768 F.3d 756, 762 (8th Cir. 2014)).

[169] *Id.* at 1092, 1095; *Lester v. Wildwood Fin. Grp., Ltd.*, 205 F.3d 1346 (8th Cir. 2000) (unpublished).

[170] Pl.'s Letter Br. (Doc. 51).

[171] *Id.*

First, no Supreme Court or Eighth Circuit case has suggested how to weigh any particular factor or consideration in the analysis.  Second, the portion of *Karlson* that is most favorable to Ms. O'Dell's position—*Karlson*'s statement that how the contract labels an individual "may be relevant but is not controlling"—is not particularly applicable to the case at bar.[172]  In context, *Karlson*'s point was that the mere labeling of a relationship as an independent contractor relationship, without anything else, is not dispositive.  This is a far cry from denigrating the importance of contractual language that both labels an individual as an independent contractor and contains all the other tax-and-benefits-related hallmarks of an independent contractor relationship.  Third, while it is true that *Lester* says that contract language can be considered as "*one circumstance* of the whole activity," this statement must be reconciled with *Karlson*'s later acknowledgement of the "especially indicative" status of the contract language where the parties' subsequent tax-and-benefits-related behavior tracks the contract language.[173]  Something can simultaneously be "one circumstance" of an analysis and also be "especially indicative" of that analysis's outcome.[174]  This is the best way to read *Lester* in light of *Karlson*.

As a district court in the Eighth Circuit, it is important to effectuate the "especially indicative" language in *Karlson*.  At the same time, it is also important to effectuate the Supreme Court's understandable insistence that an independent contractor label will not save an employer

---

[172] *Karlson,* 860 F.3d at 1092.

[173] *Id.* at 1095 (cleaned up); *Lester*, 205 F.3d 1346 (emphasis added) (cleaned up).

[174] Although not cited by Ms. O'Dell, it is only fair to discuss *Hodgson v. Taylor*, 439 F.2d 288 (8th Cir. 1971).  In that case, the Eighth Circuit noted that "labeling [the workers] as independent contractors does not affect [their] job status, for the dispositive questions under the Act are those of economic reality." *Id.* at 290 (internal citations omitted).  The contract labeled the workers as independent contractors when they performed certain tasks at night, even though they were labeled as employees when they performed those same tasks during the day. *Id.* at 289.  The district court found that the workers were independent contractors when they worked at night.  The Eighth Circuit reversed the district court, noting that the realities made clear that the workers were employees—especially given that they were labeled as employees when performing the same tasks during the day. *Id.* at 289–90.  *Hodgson* does not foreclose treating the contractual language as important.  It is just that, on the facts of that case, the economic realities clearly overcame the contractual labeling of the workers as independent contractors.

if "the work done, in its essence, follows the usual path of an employee . . . ."[175]  The best way to effectuate both of these principles (without contravening either) is the use of a rebuttable presumption.  That is, where (1) the contract labels the relationship between the individual and company as an independent contractor relationship, (2) the remaining contractual provisions, such as tax-and-benefits-related provisions, set out an independent contractor relationship, and (3) the tax-and-benefits-related behavior of the parties after entering into the contract is consistent with the contract language, the individual will be presumed an independent contractor for purposes of the FLSA.  That presumption can be overcome if the economic realities test clearly and convincingly establishes an employer-employee relationship.

Ms. O'Dell is correct that no case, to date, has expressly employed a rebuttable presumption.  But it is equally true that no case has expressly foreclosed the use of such a mode of analysis.  And the Court's read of *Karlson* strongly implies the need for this type of approach.  Moreover, the use of a rebuttable presumption in favor of the contractual description of the parties' relationship honors and gives serious credence to the intentions of the parties.  In nearly all other areas of contract law, courts strenuously endeavor to give effect to the parties' intentions.[176]  There

---

[175] *McComb*, 331 U.S. at 729.

[176] A presumption that the language of a contract accurately describes the parties' relationship is not a novel idea.  *U.S. Fidelity & Guar. Co. v. Guenther*, 281 U.S. 34, 37 (1930) ("[C]ontracts are to be construed according to the sense and meaning of the terms which the parties have used . . . ."); *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992) (stating that it is a "well-established principle[] of contract law" that a court "must consider the sense and meaning of the words used by the parties . . . in their plain, ordinary meaning" (citation omitted)).  Indeed, in almost any (and it might not be a stretch to say every) other context in which contractual language is at issue, a court starts with the language of the contract and then, when necessary, looks to extraneous evidence to determine whether that extraneous evidence provides a reason to alter or set aside the contractual language.  *See, e.g.*, *U.S. Through Small Bus. Admin. v. Light*, 766 F.2d 394, 396 (8th Cir. 1985) ("Under the parol evidence rule, extrinsic evidence is inadmissible to vary, contradict, or add to a written contract which is unambiguous . . . ."); *Griffin*, 310 Ark. at 168, 832 S.W.2d at 818–19 ("The parol evidence rule prohibits introduction of extrinsic evidence, parol or otherwise, which is offered to vary the terms of a written agreement. . . . Its premise is that the written agreement itself is the best evidence of the intention of the parties."); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67–68 (2010) (stating that a contract should be enforced "according to [its] terms" unless invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability" (citations omitted)).

It's not hard to see why the contract language is something that has to be overcome, as opposed to being just some other factor for consideration in a totality-of-the-economic-circumstances analysis.  The parties to the contract get to

is no good reason to treat FLSA cases as occupying some parallel universe where we don't care about the parties' bargain and meeting of the minds.

The parties' intentions and understandings are best gleaned from the plain and ordinary meaning of the words used in their contract.[177]  Specifically, explicit language in a contract classifying an individual as either an independent contractor or an employee strongly indicates the parties' intentions.  But other contract provisions are also indicative of the parties' intentions—for example, language setting out whether the individual is eligible for workers' compensation or

---

define the nature of their relationship.  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) ("[A]s with any other contract, the parties' intentions control." (citation omitted)); *Griffin*, 310 Ark. at 169, 832 S.W.2d at 819 ("[T]he first rule of interpretation of a contract is to give the language employed the meaning which the parties intended.").  And the law assumes that two legally competent parties who came together, negotiated an agreement, and reduced that agreement to writing were also able to effectively represent their own interests and ensure that the written agreement accurately reflected the agreement reached.  Essentially, the law views the contracting parties as adults who knew what they were doing and, therefore, don't need (or don't deserve) a judge to come in on the back end and tweak the agreement to favor one side.  That explains why something like a mere disparity in bargaining power generally will not overcome clear, unambiguous contract language.  *See GGNSC Holdings, LLC v. Lamb By and Through Williams*, 2016 Ark. 101, at 14, 487 S.W.3d 348, 357 (stating that a contract may be "unconscionable" when, among other things, there was "a *gross inequality* of bargaining power" (emphasis added)); *see also Lamps Plus, Inc. v. Verela*, 139 S. Ct. 1407, 1417 (2019) (noting that a contract will be construed against the drafter "only as a last resort" (citation omitted)).  Instead, the party trying to alter or set aside the contractual language would likely carry the heavy burden of showing that the party seeking to enforce the contract exercised "coercion" sufficient to cause a "loss of volition" by the party trying to avoid the contract.  *Oberstein v. Oberstein*, 217 Ark. 80, 86–87, 228 S.W.2d 615, 620 (1950); *see also W.R. Grimshaw Co. v. Nevil C. Withrow Co.*, 248 F.2d 896, 904 (8th Cir. 1957).

To be sure, some contracts are not entitled to any legal effect, no matter the clarity of the contractual language, because they contain agreements to violate, or seriously undermine, the law.  *See Canal Ins. Co. v. Ashmore*, 126 F.3d 1083, 1087 (8th Cir. 1997) ("The general rule is that a contract is against public policy if it is injurious to the interests of the public, or contravenes some established interest of society or some public statute, or is against good morals, or tends to interfere with the public welfare." (quoting *Ark. Blue Cross & Blue Shield v. Hicky*, 50 Ark. App. 173, 177, 900 S.W.2d 598, 600 (1995))).  This rule is known as the "against public policy" rule.  *See id.*  And it would be fair to say that enforcing an agreement that incorrectly (whether inadvertently or as a result of the parties' bad faith) designated someone as an independent contractor would undermine the FLSA and thus contravene public policy.  But this Court's holding is in complete accord with the against-public-policy rule.  As further discussed below, if there is evidence of a sham contract, or if the economic realities test clearly and convincingly establishes that the parties incorrectly designated the individual as an independent contractor, then the Court would not give effect to that contractual definition.

[177] *Guenther*, 281 U.S. at 37 ("[C]ontracts are to be construed according to the sense and meaning of the terms which the parties have used . . . ."); *Alexander v. McEwen*, 367 Ark. 241, 244, 239 S.W.3d 519, 522 (2006) ("The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. In construing any contract, we must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it. It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement." (citations omitted)).

fringe benefits, language setting out whether the individual needs to indemnify the company for any losses, and language classifying the individual for tax purposes.[178]  From these provisions, it is possible to determine whether the contract was structured to create an employer-employee relationship or an independent contractor relationship.  And, of course, subsequent behavior by the parties that conforms to the foregoing provisions strengthens the notion that the contract is a real reflection of the parties' intentions.

Still, the presumption is not dispositive.  First, the presumption would not apply at all if the contract at issue is a sham with respect to the relationship created.  For example, discovery could uncover smoking-gun evidence indicating that one party or both parties crafted and signed an independent contractor agreement knowing full well that the relationship was really going to be an employer-employee relationship.[179]  If there was evidence of such manipulation in the record, then the presumption created by the contract in favor of an independent contractor relationship would (at least) fall by the wayside.[180]  Second, even assuming both parties were acting in good faith when structuring the contract as an independent contractor agreement (i.e., that part of the contract is not a sham), the presumption in favor of the independent contractor classification can be overcome if the economic realities test clearly and convincingly establishes an employer-employee relationship in practice.

Armed with the overall approach to deploy, the Court now turns to the facts of this particular case.  The Court will first determine whether a presumption is appropriate.  If it is, the

---

[178] *See Karlson*, 860 F.3d at 1095.

[179] The Court acknowledges that the likelihood of having a case with such smoking-gun evidence is slim.  But slim is not none.

[180] It might be that, depending on the specifics of a given sham scenario, the presumption flips instead of simply falling away.  Because the instant case does not involve any evidence of a sham, the Court need not explore or detail this possibility.

Court will then determine whether the presumption is rebutted.  Because we are on summary judgment, all of the legal questions will be answered assuming the most pro-plaintiff read of the historical facts that could be reached by a rational juror.

## I.   Presumption From the Agreements that Ms. O'Dell is an Independent Contractor

The language in Ms. O'Dell's Independent Contractor Agreements cuts strongly in favor of independent contractor status.  Both Agreements were clear that Ms. O'Dell's relationship with QualScript "shall be that of an independent contractor, and not that of an agent or employee."[181] And in addition to both Agreements being titled "Independent Contractor Agreement," Ms. O'Dell was referred to as either an "Independent Contractor" or a "Contractor" over 100 times across both Agreements.[182]  She was not referred to as an employee a single time.  In fact, the Agreements explicitly stated that Ms. O'Dell was not an employee throughout.[183]

The Agreements also stated that QualScript would not provide fringe benefits, contribute to workers' compensation, or withhold any taxes.  With respect to fringe benefits, the Agreements stated that Ms. O'Dell was not "eligible for, nor entitled to, and shall not participate in, any of QualScript's pension, health or benefit plans," because such plans were "limited solely to" QualScript's employees.[184]  With respect to workers' compensation, the Agreements stated that because Ms. O'Dell "is not an employee" of QualScript, QualScript would "not obtain Workers'

---

[181] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 3; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 3.

[182] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1); Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2).  The Business Associate Agreement also referred to Ms. O'Dell as "Independent Contractor" or "Company" over 40 times throughout.  Ex. B (Business Associate Agreement) to Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[183] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1); Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2).

[184] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 8; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 6.

Compensation insurance" for Ms. O'Dell.[185]  Finally, with respect to taxes, the Agreements stated that no taxes would be "withheld or paid by QualScript on behalf of" Ms. O'Dell.[186]

There's more.  The Agreements required Ms. O'Dell to pay out of her own pocket for insurance, expenses, and equipment and materials.  Specifically, the Agreements stated that Ms. O'Dell was required to indemnify QualScript from any losses, damages, costs, or expenses resulting from Ms. O'Dell's services.[187]  The Agreements also stated that QualScript was not responsible for Ms. O'Dell's expenses (unless otherwise agreed to in writing).[188]  And the non-RAPA Agreement provided that Ms. O'Dell "shall supply, at her sole expense, all equipment, tools, materials and/or supplies to accomplish the work to be performed."[189]

The language of the Agreements unquestionably indicates the parties' desire to form, and the formation of, an independent contractor relationship.  While some of the language is neutral, there is nothing that shifts the balance meaningfully towards employee status.[190]  In sum, the Agreements create a presumption that Ms. O'Dell was an independent contractor.  This is especially so where, as here, the subsequent tax-and-benefits-related behavior of the parties was

---

[185] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 11; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 9.

[186] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 7; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 5.

[187] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 10; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 8.

[188] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 5; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 4.

[189] Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 6.

[190] Here are some examples of contract provisions that the Court finds neutral on their face.  Ms. O'Dell had no authority to bind QualScript; Ms. O'Dell couldn't disclose trade secrets or confidential information; Ms. O'Dell couldn't solicit QualScript's clients; and Ms. O'Dell couldn't assign, waive, or modify the Agreements.  Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶¶ 15–18, 20–22; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶¶ 12–15, 17–19.  None of these provisions is indicative of a particular type of relationship, and they are certainly not inconsistent with an independent contractor relationship.

Perhaps the closest call is the provision requiring Ms. O'Dell's work to "be of the highest professional standard" and to be "performed to . . . QualScript's reasonable satisfaction."  Ex. 1 (non-RAPA Agreement) to Answer (Doc. 7-1) ¶ 2; Ex. 2 (RAPA Agreement) to Answer (Doc. 7-2) ¶ 2.  But the Court finds that "quality control measures are entirely consistent with the standard role of a contractor who is hired to perform highly technical duties."  *Roslov*, 218 F. Supp. 3d at 974 (internal quotation marks and citation omitted).

entirely consistent with the language of the agreement.  Ms. O'Dell signed a W-9 in which she indicated that she was an "Individual/sole proprietor" and that she was "not subject to backup withholding . . . ."[191]   And QualScript issued Ms. O'Dell a Form 1099 each year.  Further, Ms. O'Dell filed a Schedule C with her taxes, claiming thousands of dollars of business expenses each year—expenses related to supplies, office expenses, telephone expenses, internet expenses, postage, outside services, small equipment, legal and professional services, and car and truck expenses.[192]   Finally, there is no suggestion that QualScript ever paid any benefits or workers' compensation to Ms. O'Dell.

Unless there is evidence of a sham, Ms. O'Dell will be presumed to be an independent contractor for purposes of the FLSA.  And unless that presumption is rebutted, her wage claims will all fail at this summary judgment stage.  Accordingly, we move on to see if there is evidence of a sham or if the presumption can be rebutted with the historical facts taken in the most pro-plaintiff light rationally possible.

## II.   There is No Evidence that the Agreements were a Sham

After a careful review of the record, the Court does not find any evidence that the Agreements were a sham.  To the contrary, classifying transcriptionists as independent contractors appears to have been standard practice in the industry.  QualScript had other transcriptionists besides Ms. O'Dell working as independent contractors.[193]   Ms. O'Dell worked as an independent

---

[191] Ex. A (Ms. O'Dell's W-9) to Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[192] Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 27-4).

[193] *See* Ex. 3 (Decl. of Rachel Rogers) to Defs.' Mot. for Summ. J. (Doc. 27-3); Ex. 1 (Dep. of Gayle Faggetti) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 20:10–25.

contractor in several of her former medical transcriptionist positions.[194] And Ms. O'Dell had hired her own transcriptionists as independent contractors before.[195]

It is also worth noting that this is not a situation where a company took advantage of an unsophisticated party by having the party sign an agreement that the party didn't fully understand. Ms. O'Dell had decades of experience in the industry and had hired her own independent contractors before.  Beyond that, Ms. O'Dell knew that she was going to be classified as an independent contractor and was attracted to the position for that reason.[196]

Because there is no evidence of a sham, the only avenue left for Ms. O'Dell is to show that the economic realities test clearly and convincingly establishes that an employer-employee relationship existed between Ms. O'Dell and QualScript.  So we now move to that analysis.

## III.   The Economic Realities Test Cuts in Favor of an Independent Contractor Relationship

Far from clearly and convincingly establishing an employer-employee relationship, the economic realities test cuts (slightly-to-moderately) in favor of finding that an independent contractor relationship existed between Ms. O'Dell and QualScript.  Again, this is true even reading the historical facts in the best light rationally possible for Ms. O'Dell.  The Court will take each factor of the economic realities test in turn.

---

[194] Dep. of Jana O'Dell (Doc. 50) at 13:5–14:3, 16:23–17:20 (discussing her time working for Doctor Anderson and for RI Unlimited).  While Ms. O'Dell doesn't explicitly state that she was an independent contractor for Doctor Anderson, she does state that she had two independent contractors working for her, and that when Doctor Anderson was bought out, she "shut [her own] business down." *Id.* at 13:6–14:3, 16:12–22.  This strongly suggests that she was an independent contractor in this role.

Ms. O'Dell was, however, paid by the hour (and thus presumably was not an independent contractor) when she worked for Doctor Weber.  But Ms. O'Dell worked in multiple different capacities for Doctor Weber, not just as a medical transcriptionist.  *Id.* at 15:16–16:8.

[195] *Id.* at 13:21–14:3.

[196] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 7.

A. **Degree of Control Exercised by QualScript over Ms. O'Dell with Respect to Her Work and Her Business Operations**

The first, and arguably most important, of the six expressly identified factors is the degree of control the company exercised over the individual with respect to that individual's work and business operations.[197]  This includes control over the individual's schedule, the type of work the individual performs, and the way the individual performs his or her work.[198]  The more control the company has over the individual, the more likely it is that the individual is "no longer a separate economic entity in business for h[er]self" and is thus an employee.[199]

The control factor weighs in favor of independent contractor status.  It is true that Ms. O'Dell had regularly scheduled shifts and was required to be on time for those shifts.  This cuts in favor of employee status.  But the regularity with which she missed some or all of a shift without consequence cuts the other way.  So does the fact that she was given an initial shot at setting her monthly schedule how she saw fit.  While Ms. O'Dell argues that her scheduling requests weren't always honored, there is only one example of this in the record—that's one example from her eight years at QualScript.[200]  And even in that example, QualScript offered to find someone to cover (at least some) of the shifts she didn't want.[201]  In any event, assuming arguendo QualScript had complete control over which days she worked—and, to be clear, no rational read of the record supports this—QualScript didn't control how productive she was during her shifts.  Some days Ms. O'Dell would stay on longer to do more work, and other days she was significantly less

---

[197] *See, e.g.*, *Karlson*, 860 F.3d at 1093–95; *Roslov*, 218 F. Supp. 3d at 974, 976; Aug. 23, 2022 Hr'g Tr. (Rough) at 21 (counsel for Ms. O'Dell stating that the control factor "seems to dominate the conversation").

[198] *See, e.g.*, *Karlson*, 860 F.3d at 1093–95; *Roslov*, 218 F. Supp. 3d at 974, 976.

[199] *Roslov*, 218 F. Supp. 3d at 976.

[200] *See supra* notes 90–95 and accompanying text.

[201] *Id.*

productive than other workers during the same time period.  She worked as fast or as slow as she wanted.

Moreover, Ms. O'Dell's ability to (1) work on either RAPA or non-RAPA work at her choosing, (2) work for other people or entities, and (3) hire subcontractors for QualScript work all weigh in favor of independent contractor status.   Ms. O'Dell doesn't dispute that she could work on non-RAPA work if she wanted to.  She just preferred to do RAPA work.  The fact that she could avoid certain types of work she didn't like also suggests independence and control over her work.  Ms. O'Dell further contends that QualScript's strict scheduling prevented her from working for other people or entities outside of QualScript.[202]  The record definitively contradicts this.  Ms. O'Dell worked for several other people and entities during her years at QualScript.  Finally, Ms. O'Dell argues that while it was theoretically possible for her to hire subcontractors, her low rate of pay made that an economic impossibility.[203]  Whether Ms. O'Dell thought it made economic sense to hire subcontractors is beside the point.  The fact is, Ms. O'Dell had the freedom to hire subcontractors if she wanted to.  And this level of discretion suggests that QualScript was comfortable with Ms. O'Dell structuring her work how she wanted to structure it.

## B.    Relative Investments of QualScript and Ms. O'Dell in Ms. O'Dell's Work

The next factor courts consider is the relative investments of the company and the individual with respect to the alleged work.[204]  Ms. O'Dell made significant investments in her

---

[202] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 11.

[203] *Id.* at 11–12.

[204] *See, e.g.*, *Karlson*, 860 F.3d at 1093–95; *Roslov*, 218 F. Supp. 3d at 975, 977.  Ms. O'Dell argues that "a multitude of case law dictates that the worker's investment should be significant in relation to the overall business being conducted." Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 13.  Thus, Ms. O'Dell argues that her investment in her work should be compared to the overall costs QualScript incurs to run its business.  *Id.*  But she does not cite any Eighth Circuit cases for that proposition.  That's for good reason.  The Eighth Circuit has disavowed such an approach, noting that "[l]arge corporations can hire independent contractors, and small businesses can hire employees." *Karlson*, 860 F.3d at 1096.

work.  Ms. O'Dell worked from home.  She was required to provide her own internet, computer, and medical books.[205]  She also paid QualScript "$10.00 a month for at least a year for [a] foot pedal."[206]  Additionally, there were significant expenses related to Ms. O'Dell's work for QualScript that QualScript was not required to pay.  As noted above in Discussion Section I, Ms. O'Dell claimed thousands of dollars of business expenses each year—expenses related to supplies, office expenses, telephone expenses, internet expenses, postage, outside services, small equipment, legal and professional services, and car and truck expenses.

It is true that QualScript made some investments in Ms. O'Dell.  QualScript provided Ms. O'Dell with three software programs: PowerScribe, Fluency, and ShareFile.  Although PowerScribe was paid for by RAPA, QualScript presumably had to pay for ShareFile.  And while Ms. O'Dell was required to pay a $10.00 semi-monthly access fee to use Fluency, at least as of July 17, 2018, QualScript had waived that fee.  QualScript also provided Ms. O'Dell with a second monitor and a pair of headphones.

Overall, this factor is a wash.  There is nothing in the record putting a dollar figure on many of these investments.  Ms. O'Dell's investment in her work-from-home setup was likely significant.  But QualScript provided Ms. O'Dell with some of the equipment she used.  And although it isn't likely, it's possible that QualScript's investments in the different software programs (relative to Ms. O'Dell) were comparable to Ms. O'Dell's work-from-home costs.  More to the point, this is really just speculation.  There are no reasonable inferences to make one way or

---

[205] Ms. O'Dell argues that her computer and internet costs should not be included in the investments analysis because she would have had a computer and internet even if she hadn't worked for QualScript.  Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 12.  While it may be fortuitous that she already had a computer and high-speed internet before taking the job, those are still part of her investment in the job.  So the Court will include both in the analysis.

[206] Ex. 1 (Decl. of Jana O'Dell) to Pl.'s Resp. to Defs.' Mot. for J. on the Pleadings (Doc. 14-1) ¶ 23.

the other.  Because the Court would be speculating as to the amounts the parties invested, the Court will not consider this factor to cut in either direction.

### C.     The Degree to which Ms. O'Dell's Opportunity for Profit and Loss was Determined by QualScript

The third factor to consider is the degree to which the individual's opportunity for profit and loss was determined by the company.[207]  Relevant to the control-of-profit inquiry is whether the individual was guaranteed a certain level of income, whether the individual controlled the amount of work she took on, whether the individual could work for other people or entities, and whether the individual could hire subcontractors.[208]  The bulk of these considerations cut in favor of independent contractor status.  However, it is necessary to note that this factor has significant overlap with the control-of-work factor.  That is why some of the analysis below will seem quite familiar.[209]  To account for the inevitable overlap, the Court treats this control-of-profit factor as weighing significantly less heavily than the other five factors, since (as noted above) the control-of-work factor weighs pretty heavily in the analysis already.

Aside from the relatively minor fixed additional pay Ms. O'Dell received for working as the weekend coordinator or working night shifts, Ms. O'Dell was paid by the line for her work. This means that Ms. O'Dell's income was tied to how many reports she took on and how quickly and efficiently she completed those reports.  As discussed above in Discussion Section III.A, QualScript had a fairly flexible scheduling system which allowed Ms. O'Dell some say in how often she worked.  But even if QualScript had complete control over how often she was scheduled to work, Ms. O'Dell was seemingly free to transcribe as much or as little as she wanted to during

---

[207] *See, e.g.*, *Karlson*, 860 F.3d at 1093–95; *Roslov*, 218 F. Supp. 3d at 974, 977.

[208] *See, e.g.*, *Roslov*, 218 F. Supp. 3d at 974, 977; *Krupicki v. Eagle One, Inc.*, No. 4:12-CV-00150-KGB, 2014 WL 12710353, at *6 (E.D. Ark. Apr. 3, 2014).

[209] *See Roslov*, 218 F. Supp. 3d at 974 (analyzing the first and third factors together because they "go hand in hand").

her scheduled shift.  The record shows that there were times when Ms. O'Dell would stay on past her scheduled shift to complete more reports (and make more money).  The record also shows that there were times when other transcriptionists completed significantly more lines than she did in the same time period she was logged in.  This is consistent with record testimony that QualScript has transcriptionists who only do RAPA work that make two-to-three times what Ms. O'Dell made.[210]

Ms. O'Dell emphasizes that she did not have control over the pace of assignments, especially during Covid when the available work decreased.[211]  But Ms. O'Dell always had the option to complete non-RAPA work, even when the RAPA work was slow.  She rarely took this option, stating that she "was having to deal with [her] parents a lot" during this time.[212]  The fact that QualScript provided Ms. O'Dell with the option to take on more work, but she denied it for personal reasons, suggests she had a significant level of control over her earnings.

Finally, as described above in Discussion Section III.A, Ms. O'Dell had the option to work for other people or entities, and she had the option to hire subcontractors for QualScript work. This ability suggests that Ms. O'Dell had discretion over how to best manage her workflow to maximize profit.  Overall, Ms. O'Dell had significant control over her own profits and losses.  So this factor cuts in favor of independent contractor status.

### D.    Skill and Initiative Required to Perform the Work

Another factor in the test looks at the skill and initiative required to perform the work.[213] The more specialized the skills required to perform the job, the more likely it is that the individual

---

[210] Ex. 2 (Decl. of Pat McCarver) to Defs.' Mot. for Summ. J. (Doc. 27-2) ¶ 10.

[211] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 14.

[212] Dep. of Jana O'Dell (Doc. 50) at 36:8–14, 75:15–19.

[213] *See, e.g.*, *Karlson*, 860 F.3d at 1093–95; *Roslov*, 218 F. Supp. 3d at 975, 977.

is an independent contractor.[214]  This factor weighs in favor of independent contractor status.  Ms. O'Dell testified that some people don't have what it takes to be good at medical transcription and conceded that medical transcription "requires highly technical skills . . . ."[215]  Ms. O'Dell had a certification and decades of experience in the transcription business.  And QualScript specifically sought to fill the role with someone who had prior experience in medical transcription or who had attended a transcription school.

Ms. O'Dell argues that she "did not exercise the initiative normally associated with an independent business owner," because she was not "involved in obtaining new customers" and she was not in "competition with other transcriptionists" for QualScript work.[216]  Ms. O'Dell does not cite any Eighth Circuit cases suggesting that these considerations—obtaining new customers or competing with other transcriptionists—are relevant considerations under this factor.  And Ms. O'Dell did have to exercise initiative to get work at QualScript.  When the work was slow, she would keep Auto Feed turned on so that she wouldn't lose her spot in the queue for work.  This suggests that she was in competition with other transcriptionists for available work.  The more skilled she was, the faster she could work; the faster she worked, the more work she could do; the more work she could do, the more she could earn.  Her work required both skill and business initiative.

### E.    Permanency of the Relationship between QualScript and Ms. O'Dell

Another factor is the permanence of the relationship between the company and individual.[217]  The more permanent the relationship, the more likely the individual is an employee

---

[214] *See, e.g.*, *Roslov*, 218 F. Supp. 3d at 975, 977.

[215] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 15; Dep. of Jana O'Dell (Doc. 50) at 18:16–19:12.

[216] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 15–16.

[217] *See, e.g.*, *Karlson*, 860 F.3d at 1093–95; *Roslov*, 218 F. Supp. 3d at 975, 977.

and not an independent contractor.[218]  In evaluating permanence, courts have considered whether the work was for a fixed term, the exclusivity of the individual's relationship with the company, and whether the amount of work fluctuated.[219]  Overall, the Court finds this factor is neutral.

The lack of a fixed term leans towards an employer-employee relationship.[220]  Ms. O'Dell worked at QualScript for eight years.  This is not a situation where Ms. O'Dell was brought on for a predefined short period of time for work on one specific project as typically exemplifies an independent contractor relationship.[221]

As to the at-will nature of the relationship, the Court is not convinced that this weighs strongly in one direction or the other.  While the Court is aware that other district courts have considered the at-will nature of a relationship to weigh in favor of independent contractor status, the Court is not persuaded by these cases.[222]  The ability of either the company or the individual to terminate the relationship at any time is often true of employer-employee relationships as well.

However, other considerations cut in favor of independent contractor status.   Ms. O'Dell was able to work for other people or entities outside of QualScript.  She did so on multiple occasions.  Additionally, Ms. O'Dell never had a guaranteed amount of work from QualScript. Overall, these considerations rebalance the scales to an even position on this factor.[223]

---

[218] *See, e.g.*, *Roslov*, 218 F. Supp. 3d at 975, 977.

[219] *See, e.g.*, *id.*

[220] *See, e.g.*, *Krupicki*, 2014 WL 12710353, at *7.

[221] QualScript argues that Ms. Rogers, a former medical transcriptionist for QualScript, testified that she had an "open-door" relationship with QualScript where she was able to work part-time "off-and-on" over a seven-year period.  Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 28) at 20; Ex. 3 (Decl. of Rachel Rogers) to Defs.' Mot. for Summ. J. (Doc. 27-3) ¶ 2.  While this may indicate that Ms. Rogers's relationship with QualScript was impermanent, it does not provide much insight into Ms. O'Dell's relationship with QualScript.

[222] *See, e.g.*, *Krupicki*, 2014 WL 12710353, at *7.

[223] *See, e.g.*, *Roslov*, 218 F. Supp. 3d at 975, 977.

### F.      Degree to which Ms. O'Dell's Tasks were Integral to QualScript

The final factor courts consider is the degree to which the individual's tasks were integral to the company's business.[224]  Ms. O'Dell argues that "[w]ithout medical transcriptionists such as [Ms. O'Dell], Defendants would not have a business because Defendants' entire business is in providing medical transcription."[225]  QualScript concedes that this factor weighs in favor of employee status.[226]  The Court agrees.

## IV.      The Presumption in Favor of the Agreements has not been Rebutted

The economic realities test—taking the historical facts underlying this test in the best possible light for Ms. O'Dell—establishes that Ms. O'Dell was an independent contractor.  Other than the degree to which Ms. O'Dell's work was integral to QualScript's business, all of the other factors are either neutral or cut slightly-to-moderately in favor of independent contractor status.  And the arguably most important factor—control over Ms. O'Dell's work—cuts in favor of an independent contractor relationship.  Since the economic realities test overall suggests (albeit very-to-somewhat modestly) the existence of an independent contractor relationship, the test obviously does not clearly and convincingly establish an employer-employee relationship.  So the presumption of an independent contractor relationship—established in Discussion Section I from the clear and explicit language of the Agreements and the parties' post-contracting tax-and-

---

[224] *See, e.g., Karlson*, 860 F.3d at 1093; *Roslov*, 218 F. Supp. 3d at 975, 977.

[225] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 16.

[226] Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 28) at 21.

benefits-related behavior—stands unrebutted.[227]   And summary judgment in favor of QualScript

is thus appropriate on all claims in this case.[228]

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED this 28th day of March 2023.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[227] Even if the Court's concededly novel presumption-based approach is incorrect, the Court would still conclude that Ms. O'Dell was an independent contractor.  As discussed in this section, an overall analysis of the six expressly identified factors cuts (at least to some extent) in favor of independent contractor status.  But let's assume for a moment that the six expressly identified factors were a complete wash or even slightly in favor of employee status.  *Karlson* clearly provides that the contract language and post-contracting tax-and-benefits-related behavior of the parties can be considered along with the six expressly identified factors.  Indeed, *Karlson* clearly says the contract language and post-contracting tax-and-benefits-related behavior of the parties can be given significant weight in the totality-of-the-economic-circumstances analysis.  Accordingly, if instead of applying a presumption approach, the Court simply considered the contract language and post-contracting tax-and-benefits-related behavior of the parties as an important extra factor, the Court would reach the same result as it has come to through the presumption approach.

[228] QualScript makes an additional argument in support of its Motion.  QualScript argues that Ms. O'Dell has not met her burden of proving the extent of her damages.  Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 28) at 22–24.  Because the Court has found that Ms. O'Dell was not an employee under the FLSA or the AMWA, QualScript is not liable to Ms. O'Dell on those claims.  Thus, the Court does not need to reach this damages argument.